### WILSON et al. v. JONES et al.

(Circuit Court, W. D. Virginia. May 26, 1896.)

1. FRAUDULENT CONVEYANCES—PREFERRED CREDITOR.
   J. was in embarrassed circumstances, and his creditors were urging him to secure their claims. He was indebted to his son for services actually rendered at a stipulated price while he was solvent. J. voluntarily executed his note, secured by a deed of trust of his personal property, in favor of his son. *Held* a valid transaction.

2. SAME—DEBT DUE TO MINOR SON.
   In such case, a bond given by the father to secure a debt to his son is not fraudulent because a part of the services were performed while the son was a minor.

3. SAME—STATUTE OF LIMITATIONS.

A deed thus executed by the father to secure the son is not void because a part of such debt is barred by the statute of limitations.

4. SAME—PREFERRED CREDITOR—VIRGINIA LAWS.

Under the laws of Virginia it is not fraudulent for an insolvent debtor to prefer one creditor over another, even where the secured creditor knows of the insolvency of the debtor. Citing Dance v. Seaman, 11 Grat. 782.

5. SAME—FRAUD OF GRANTEES—INADEQUATE CONSIDERATION.

J., while insolvent, and pressed by creditors for payment, conveyed certain property to his two sons and a son-in-law. The deed was made at J.'s home, in the absence of and without the knowledge of the grantees, who subsequently assented verbally to its provisions. The consideration expressed was less than half the value of the property, and said to be part cash, part as security for debts due the grantees, and part for a debt of the grantor assumed by the grantees. No money was in fact paid; the grantees had not demanded security for any debts; they had not, in writing, assumed to pay any debt of the grantor to a third party, nor were they persons of means. *Held,* (1) that the grantees were not purchasers for value without notice; (2) that the deed was fraudulent and void.

Blair & Blair and T. L. Massie, for plaintiffs.
Moore & Hill, Fulton & Fulton, and J. H. Larew, for defendants.

PAUL, District Judge. This is a creditors' suit, brought by the complainants on behalf of themselves and all other creditors of the defendant Thomas Jones who may come into the suit and contribute to its costs. The bill contains the usual prayer that an account may be taken by a master, ascertaining the liens upon the real estate and personal property of said Thomas Jones, their amounts and priorities, and the real and personal property liable to such liens. It also prays that the court will declare null and void the following deeds, to wit: (1) A lease made by said Thomas Jones to D. A. Jones on the 11th day of January, 1895, leasing a farm of the former to the latter for a term of five years. (2) A deed of trust executed by said Thomas Jones to J. E. Moore, trustee, conveying a large amount of personal property to said trustee to indemnify Mary A. Jones, wife of said Thomas Jones, as indorser for said Thomas Jones on certain negotiable notes described in the deed, and to secure the payment of a bond for $3,465.38, executed by said Thomas Jones to D. A. Jones, bearing date on the 1st day of January, 1895. (3) A deed made on the 11th day of January, 1895, by said Thomas Jones and wife to W. H. Aston, Thomas J. Jones, and Archibald Jones, conveying to the said grantees certain real estate, including a zinc plant thereon, in Pulaski City, Va., known as the "Pulaski Smelting Works." The court is asked to declare null and void these several deeds on the ground that they were all executed for the purpose of hindering, delaying, and defrauding the creditors of said Thomas Jones, the sole grantor of the first and second deeds, and joint grantor with his wife in the third. By agreement of counsel, for all parties in interest, the question as to the validity of the lease executed by said Thomas Jones to D. A. Jones has been settled to the satisfaction of all concerned. It is also agreed by counsel that the deed of trust from said Thomas Jones to J. E. Moore, trustee, of January 1, 1895, is valid as to its provision indemnifying Mrs. Mary A. Jones as the

indorser for said Thomas Jones on the notes mentioned in the deed; and these two questions are eliminated from this discussion.

This leaves two questions to be decided: First. Is the deed of trust from said Thomas Jones to J. E. Moore, trustee, of January 1, 1895, null and void as to the bond of Thomas Jones to D. A. Jones for $3,465.38, secured by this deed? Second. Is the deed from Thomas Jones and wife to W. H. Aston, Thomas J. Jones, and Archibald Jones, of January 1, 1895, null and void? The master to whom the case was referred reports both deeds (except as to Mrs. Mary A. Jones, in the deed of trust) null and void, on the ground that they were made for the purpose of hindering, delaying, and defrauding the creditors of the said Thomas Jones. Exceptions to the findings of the master are taken, and the questions are thus presented to the court for decision. They will be considered in the order presented.

The evidence shows that Thomas Jones was in embarrassed circumstances when he executed these deeds, the master's report showing that his liabilities largely exceeded the value of all his property, real and personal. Some of his creditors were urging him to secure their debts, and a few days after the execution of the deeds he confessed judgments in favor of different creditors for large amounts. He must have known he was insolvent. The court will consider first the deed of trust by which Thomas Jones seeks to secure to his son, David A. Jones, the payment of his bond for $3,465.38. The evidence shows that this son, David A. Jones, is 26 years old; that he left school 9½ or 10 years ago, and has supported himself ever since; that, after leaving school, he first went to work for the Bertha Zinc Works as a laborer at $1 per day, and that his wages were increased from time to time until the company paid him $600 per year; that he had no family of his own, but lived in the family of his father, and paid board to his mother at the rate of $10 to $15 per month; that he had no contract to pay this board, but paid it to his mother of his own volition; that the money he saved out of his wages while working for the Bertha Zinc Works did not exceed $300; that in August, 1889, he left the service of the Bertha Zinc Works and took charge of his father's farm of about 800 acres and a sawmill belonging to his father at a salary of $700 for the first year and $800 for the second year, which his father said he would guaranty to him; that, while on the farm, he had a room there, and boarded with a man on the farm, his father paying the man for the board, and he (David A. Jones) charging the amount of said board to himself on the books he kept at the farm; that, with the exception of one summer, he was on the farm continuously from the time he went there, August 1, 1889, up to January 1, 1895; that he kept a set of books at the farm, and the only account that was kept between him and his father was kept in said books by him (David A. Jones), and that his father looked over the account from time to time (a copy of this account is filed with the answer of David A. Jones, and shows the total balance due him from his father as of January 1, 1895, to be $3,465.38, for which amount Thomas Jones executed the note to David A. Jones, secured in the said deed of trust); that the amount due him was more than that, but that he knocked off some interest,

and was willing to take the sum named for the debt; that the note was executed January 11, 1895, though dated January 1, 1895; that for about 18 months of the time he was a minor; that the said deed of trust conveyed all the personal property owned by said Thomas Jones, and it made no provision for changing the possession of the property; that on the morning of January 11, 1895, the date of the deed of trust, Thomas Jones sent for his son, David A. Jones, who was out at the farm, to come in to Pulaski City to the home of Thomas Jones, and, on his doing so, the father informed the son that he desired to make him (the son) safe as to what he (the father) owed him, and proposed to give him a note for the amount due him, and to secure said note by a deed of trust on all his (the father's) personal property; that his father did not tell David A. Jones that any one was pushing him for debt, did not tell him what was going on, but only told him that he desired to secure him (the son) in case anything should happen; that his father proposed to David A. Jones to let him take the farm and run it the next year on his own account; that David A. Jones knew his father was in debt, but did not know the extent of his indebtedness, nor whether the property of his father was sufficient to pay his indebtedness or not; that the value of the personal property conveyed by the deed of trust was estimated by Thomas Jones at $8,000 or $10,000; that David A. Jones believed at the time the deed was executed that the property conveyed was more than was necessary to secure the amount due to himself and the amount required to indemnify his mother, which together amounted to $7,086.17, and that he knew of the execution liens and taxes then outstanding against said property; that there was no inventory of said property taken at the time the deed of trust was executed, but an inventory of the property was taken by the trustee after the institution of this suit, which showed the value of the property conveyed by said deed of trust to be $6,279.08, including $80 worth of stock which have died since the deed of trust was executed, and $1,765 worth of the said property which has been levied on and sold by the sheriff of Pulaski county to satisfy fi. fas. in his hands, and by the treasurer of said county to pay taxes in his hands, leaving a balance of said personal property amounting to $4,434.08, applicable to the payment of the debt secured to David A. Jones and to indemnify Mrs. Mary A. Jones as indorser on the notes described in the deed of trust.

After a careful examination of the facts disclosed by the evidence, the court fails to discover such fraudulent intent in the execution of the deed of trust as to render it null and void. Certain it is that the evidence does not establish any fraudulent intent on the part of David A. Jones in accepting the security given him by the deed of trust for the payment of his debt. It was a bona fide debt, based on a contract for labor at a certain stipulated sum, made at a time when Thomas Jones was not in embarrassed circumstances. It would be unreasonable to conclude that a young man of sufficient energy and industry to commence life at 16 years of age by working as a day laborer at $1 per day, would, after he had attained a position in which he commanded a salary of $600 per annum, volun-

tarily relinquish it, and go to work on his father's farm, without an agreement that he was to be compensated. The services contracted for were rendered at the agreed price. The correctness of the account filed with the answer of David A. Jones is not questioned. The whole history of this indebtedness repels the presumption contended for by the complainants' counsel that these were gratuitous services rendered by a child to a parent. Nor can the contention of counsel for the complainants that the bond secured is tainted with fraud, because part of the services for which it was given were rendered during the minority of David A. Jones, be sustained. The father had a right to release the services of his son during his minority, and to contract to pay him for his labor; especially when the father's condition was solvent. 1 Minor, Inst. (4th Ed.) 430; 1 Pars. Cont. (6th Ed.) 309.

Equally untenable is the contention that, because a small part of the account of David A. Jones was barred by the statute of limitations, it was an act of fraud to include such part in the bond given him by Thomas Jones. We know of no rule of law or of morals which compels a man to plead the statute of limitations to an honest debt, even though the debt be due to his own son.

Much of the argument of counsel for plaintiff seems to be based on the ground that if an insolvent debtor makes a deed of trust to secure one or more of his creditors, and the creditor knows it, or has reason to believe that the debtor is insolvent, the deed of trust is fraudulent as hindering, delaying, and defrauding creditors. Under the laws of Virginia it is not fraudulent for an insolvent debtor to prefer one creditor over another, even where the secured creditor knows of the insolvency of the debtor. If the debt is a bona fide obligation, the creditor has a right to secure it in such manner as does not work a fraud upon other creditors. "The fact that creditors may be delayed or hindered is not of itself sufficient to vacate such a deed, if there is absence of fraudulent intent. Every conveyance to trustees interposes obstacles in the way of the legal remedies of the creditors, and to that extent may be said to hinder and delay them." Dance v. Seaman, 11 Grat. 782. The Virginia statute against fraudulent preferences (section 2458, Code Va. 1887) provides that any judgment suffered or obtained with intent to delay, hinder, or defraud creditors shall, as to such creditors, be void. It can as rightly be claimed that the creditors of the defendant Thomas Jones who took a confession of judgment on their debts on the 16th of January, 1895, as appears by the record in this cause, and who thus obtained a preference over the creditors who took a confession of judgment on their debts on the 18th of the same month, did so with intent to hinder, delay, and defraud the other creditors who were not so preferred. Yet no such contention is or could be made if the debts thus preferred were justly due.

As to the remaining question under consideration, namely, the validity of the deed from Thomas Jones and wife to W. H. Aston, Thomas J. Jones, and Archibald Jones, dated 11th of January, 1895, the evidence shows the following state of facts: On the 3d day of January, 1895, Thomas Jones was insolvent, and was being pressed

for payment of debts by some of his creditors. On that day he entered into a contract in writing with one F. B. Wheeler to convey to said Wheeler one undivided half interest in the property in question (named in the record as the zinc plant), free from all incumbrances except a debt of $5,000 owing to the Pulaski Land & Improvement Company; the consideration for said undivided half interest being the sum of $15,000, payable, as to $5,000 thereof, within 14 days from the date of said contract, and the remaining $10,000 within 90 days from said date, in such sums and at such times as might be needed in the business, but to be completed within that time. The contract provided for the formation of a joint-stock company, to be formed and organized forthwith by the parties to said contract, the stock of which should be equally divided between them. This contract was signed by said Thomas Jones and F. B. Wheeler, but it does not appear from the evidence that anything further was done in the matter. During the first 10 days of the month of January, 1895, George M. Holstein, as agent, and T. L. Massie, as attorney, for J. M. Edwards, one of the complainants in this suit, made several ineffectual efforts to get the defendant Thomas Jones to execute a mortgage upon the said zinc plant to further secure the payment of a debt to said J. M. Edwards, there being at that time a deed of trust upon the output of the zinc plant to secure the said debt. On January 11, 1895, the defendant Thomas Jones executed the several deeds hereinbefore referred to. This deed is the deed of conveyance from Thomas Jones and wife conveying the property above mentioned as the zinc plant, including the land on which it is situated, to W. H. Aston, T. J. Jones, and Archibald Jones. It was executed at the home of Thomas Jones, the grantor. None of the grantees were present. None of them had been consulted about the sale or purchase of the property of which they were, without their knowledge, made the purchasers, nor had they been apprised that such a deed was contemplated. Thomas J. Jones, one of the grantees, was shown the deed on the night it was executed, and he, some days later, informed Archibald Jones about it, and about the last of that month or the first of the ensuing month W. H. Aston was also informed of it, though each of the said grantees, on being informed of the execution of the deed, assented, but not in writing, to its provisions. The consideration named in this deed is $5,500 cash in hand paid by the grantees to the grantor, though the evidence shows that no money was paid, and the further consideration that said grantees, having assumed and agreed to pay, for the benefit of said Thomas Jones, to the Pulaski Land & Improvement Company, the sum of $5,500, owing from said Thomas Jones to said company, for which they executed no bonds or other writing. the $5,500 stated in said deed as cash in hand paid by the grantees to the grantors is claimed to be made up of sums of indebtedness from Thomas Jones to the grantees, respectively, as follows: To Thomas J. Jones for $2,000, to Archibald Jones for $1,000, and to W. H. Aston for $2,500. There is no reference in the deed to these debts. The debt alleged to be owing to Thomas J. Jones, it is claimed, was on account of loans made at various times from said Thomas J. Jones to Thomas

Jones, and of debts assumed for him. As to the debt alleged to be owing to Archibald Jones ($1,000), the said Archibald Jones says, in his answer, that that sum was not owing to him at that time; that he was absent when the deed was executed, and upon his return he stated to his father what was the true amount owing to him, which he says was $374.86, and that by the direction of his father he paid a part of a note owing to his sister from his father, and assumed the balance. Yet even under this ingenious arrangement, made after the execution of the deed, the evidence shows the amount of the alleged indebtedness from Thomas Jones to Archibald Jones, claimed to have been on account of certain small loans from time to time, and for services as a chemist in making certain chemical tests for him, and for his assumption of the payment of the note to his sister, the amount of this alleged indebtedness was 20 per cent.—one-fifth— less than the $1,000 stated in the deed to have been cash paid in hand. The debt alleged to have been owing from Thomas Jones to W. H. Aston is claimed to have been on account of a liability of said W. H. Aston as accommodation indorser for two notes, one for $1,000 and the other for $1,500, both drawn by J. D. Whitman, and indorsed by Thomas Jones and said W. H. Aston. The said W. H. Aston also claims in his deposition that Thomas Jones owes him a further sum of between $400 and $500.

On the 18th day of January, 1895, Thomas J. Jones, W. H. Aston, and Archibald Jones, claiming to be owners of the zinc plant, entered into an agreement under seal with F. B. Wheeler to convey to him one undivided half interest in said zinc plant for $15,000, upon terms and stipulations substantially the same as those of the agreement of January 3, 1895, between Thomas Jones and said F. B. Wheeler, as above stated, including the formation of a joint-stock company, except that it was stipulated that Thomas Jones should be employed by said joint-stock company, when formed, to take charge of and manage its mechanical operations. This agreement is signed by Thomas J. Jones and F. B. Wheeler in person, and as to W. H. Aston and Archibald Jones by Thomas J. Jones as attorney in fact, though there is no evidence that said Thomas J. Jones had any power of attorney authorizing him to sign the names of said W. H. Aston and Archibald Jones to a sealed instrument, or for any other purpose; and this was done before W. H. Aston even knew that he was one of the purchasers of the property. On the 11th of January, 1895,—the date of the deed conveying this property from Thomas Jones to his two sons and his son-in-law, Aston,—an application for a charter for the Pulaski Smelting Works was signed and acknowledged by Thomas Jones, who was made vice president and general manager and a director in said company, and among other petitioners for this charter was Thomas J. Jones, one of the grantors in the deed under consideration. J. R. Miller, one of the incorporators of the said company, testifies that a contract was made about that time by which Thomas Jones himself was to put this very zinc plant into this company, of which he was a member and stockholder, at a certain stipulated price, to be paid partly in cash and partly in the stock of the company for his own use, notwithstanding the fact that on that very day he had deeded to his two sons and his

son-in-law all of the right and title he had in this zinc plant, which he had agreed to put into the company for his own use. On January 19, 1895, a charter was granted by the circuit court of Pulaski county, Va., to F. B. Wheeler, Thomas Jones, T. J. Jones, J. R. Miller, A. J. Miller, and J. E. Moore, upon their application above mentioned for a joint-stock company to be called the Pulaski Smelting Works; and J. R. Miller, one of the incorporators, has testified, as before stated, in his deposition, that Thomas Jones was to put the zinc plant above mentioned into the said company at a certain stipulated price to be paid partly in cash and partly in the stock of the company for the use of the said Thomas Jones; the witness Miller also testifies that neither T. J. Jones nor Archibald Jones nor W. H. Aston was present when such agreement was made, nor, so far as the evidence shows, did they, or any of them, know anything about this disposition of a valuable property which they now claim belonged to them at that time in fee simple, and of the conveyance of which to them they, or at least W. H. Aston, one of them, was at that time entirely ignorant. It is established by the proofs that on the 11th day of January, 1895, Thomas Jones, in the absence of, and without the knowledge of, his sons, Thomas J. Jones and Archibald Jones, and his son-in-law, W. H. Aston, conveyed to these parties, for the price of $11,000, property one-half of which, on the 3d day of January, 1895, he had sold to F. B. Wheeler for $15,000, and which his sons and son-in-law, the grantees in this deed, estimated to be worth $30,000, selling one-half thereof, on the 18th day of January, 1895, for $15,000. He gives the grantees in this deed credit for $5,500 paid cash that day, and makes them assume to pay, without their consent or knowledge, to the Pulaski Land & Improvement Company, a debt of $5,500 and interest. None of these grantees had ever asked to be secured for the payment of their debts, or pretended debts. Not one dollar was paid in cash in hand, as stated in the deed. Two of the grantees were his sons and the other his son-in-law, and the evidence shows that his son T. J. Jones had always resided with him, and so had his son Archibald Jones, except when temporarily absent at work. It is scarcely necessary to discuss the validity of the claim of T. J. Jones for $2,000, which it is claimed is his share of the pretended cash payment mentioned in the deed. The inadequacy of the price mentioned in the deed makes the question of the validity or invalidity of this claim a matter of no moment. It is further shown that these two sons of the grantor owned no real estate whatever, and only a few hundred dollars of personal property. There is no proof that W. H. Aston, the son-in-law, is a man of any means, and, if he owns any property, the proof shows that he is indebted in large sums. It is further shown that he has never paid the $2,500 for which he is indorser on the two notes, and for which it is claimed he is given credit in what is mentioned as the cash payment in the deed. Thomas Jones took no security for the payment of the large debt owing to the Pulaski Land & Improvement Company, which he makes the grantees in this deed assume, without their knowledge or consent at the time of making the deed, and which they are wholly unable to pay; a portion of it being now due and unpaid. The grantees have never notified the Pulaski

Land & Improvement Company that they would pay this lien, nor have they assumed it by any writing signed by them, as is required by the statute of frauds in Virginia. Code Va. § 2840.

In view of the facts recited, it is not possible to arrive at any other conclusion than that the numerous and intricate transactions in connection with this property, commencing on the 3d day of January, 1895, and continuing to the 19th day of January, 1895, were all a part of a shrewdly devised scheme for one purpose. That scheme had for its object, from its inception to its conclusion, the defeat of Thomas Jones' creditors in their efforts to secure the payment of their debts out of this property, and to retain it, if not in the name, at least under the complete control and disposition of Thomas Jones. The fraudulent intent of Thomas Jones, the grantor in the deed sought to be annulled, is so plain and palpable that to discuss the evidence establishing it would be a needless waste of time. When we consider the willing acquiescence of the grantees in the fraudulent acts of the grantor, when brought to their attention, and the readiness with which they submitted to become the agency by which the fraud was to be consummated, we have no difficulty in determining that they knew of the fraudulent intent of the grantor, and, so far as they were permitted to have any voice in the matter, were ready participants in it, and endeavored to share its fraudulent results. The contention that these grantees were purchasers for value without notice cannot be sustained. The pretended payments which constitute the cash paid in hand mentioned in the deed, if credit could under any circumstances be given them, constitute such an utterly inadequate consideration as to shock the conscience. The inability of the grantees to pay the debt which the deed purports they are to assume; their failure to give any security for its payment, even their own bonds, either to Thomas Jones or the Pulaski Land & Improvement Company; the value of the property to be transferred being estimated at least twice in the month of January, 1895, at $30,000, yet sought to be conveyed to these grantees for a pretended consideration of only $11,000; the near relationship of the grantor to the grantees; the ignorance of the grantees of the pretended sale and conveyance to them at the time it was made,—give to the transaction all the characteristics of a voluntary and fraudulent conveyance. This deed must be set aside and annulled, and a decree entered for a sale of the property it attempts to convey. The validity of the deed of trust of January 11, 1895, conveying the personal property of Thomas Jones to J. E. Moore, trustee, is sustained.